Mr. Milch. Thank you, Your Honor. I may have pleased the Court. The Patent Trial and Appeal Board committed two errors in its final written decisions. First, with respect to claim construction, and second, with respect to its secondary considerations analysis. In reaching what was purportedly the broadest reasonable interpretation here, the broadest reasonable interpretation of the term LIDAR, the Board committed the cardinal sin of claim construction by reading in limitations appearing in a preferred embodiment despite the lack of any expressive disavowal or words of manifest exclusion by the patentee. And the Court's Phillips case... Counsel, can I take your description of those two errors to mean that if we do not overturn the claim construction, then your primary argument is really just as it relates to the objective indicia of non-obviousness? That's correct, Your Honor. Okay. Because, I mean, you do spend a page saying that even under the Board's claim construction, you could still make obviousness arguments, but beyond the objective indicia point, there really aren't any that you're making. Is that right? Oh, I'm sorry, Your Honor. I misunderstood your question. So, let me rephrase. If you don't overturn the claim construction, there is still an argument that in the Board's analysis of the primary reference, the Mizuno reference, that they overly limited the embodiment that was applied, and there is still an argument that Mizuno could be interpreted to be time of flight. Well, doesn't your expert's testimony contrasting Mizuno's system with triangulation or time of flight systems very damaging to that argument? It is, Your Honor, and I think that the issue is whether or not the Board considered the entire reference. It's not just the expert's testimony, but also whether or not the Board considered the entire reference or just a particular embodiment. Okay, but the Board did cite, you know, the question is whether the evidence that they cited is substantial enough, and the Board did cite a variety of other references to support their conclusion. Did they not? That's right, Your Honor, and I think that would be a tough carry here in terms of substantial evidence. Okay. So, but you better focus on claim construction. Thank you, Your Honor. So, the Quartz-Phillips case here provides the hierarchy. You start with the claims, and the claims should be given their plain meaning in light of the entire specification. And here, the claims are broad. They're not limited to autonomous vehicles. They're not limited to long-distance outward-facing sensing. Counselor, you can't get away from the makes pretty clear in Column 14, if not earlier, that this is a post-time-of-flight meaning for LIDAR. Yes, Your Honor, but if you look at the entire specification, again, the claims aren't limited. And again, starting with the claims, because that's where we start our analysis, and LIDAR is a broad term. And from the initial petition, the petitioner argued that the term LIDAR is essentially what the acronym says it is, and that's part of the specification as well. It's laser imaging detection and ranging, and that's Appendix 412. The patent team never ascribed any particular meaning to the term LIDAR beyond its acronym, and they never demonstrated any intent to limit the term just to post-time-of-flight methods. And notably, neither party sought construction of the term LIDAR in the parallel district court action. Well, in fairness, Counsel, isn't the entirety of the term a LIDAR-based 3D point cloud system comprising, so that a LIDAR-based 3D point cloud system means that we have to take into consideration the board's construction of 3D point cloud system, right? Absolutely, Your Honor. So, and Velladine argues that if you read LIDAR so broadly as the petitioner would propose, that it makes the term meaningless in the context of the claim, especially in light of the construction of the 3D point cloud. But that's not so, Your Honor. Quantergy agrees that the 3D point cloud requires pulses, but the board's construction of 3D point cloud does not require timing, as Velladine suggests in the red brief at page 30. And in fact, the patent owner's expert admitted that triangulation systems only typically use continuous-wave lasers, not that they only use continuous-wave lasers, and I think that's Well, is there anything in the specification or written description, I guess I should say, where they don't, where they describe a technique other than pulsed time-of-flight LIDAR? Yes, Your Honor. So, in the background, there is description of other systems, that some prior art systems, including what's called flash LIDAR. Right, because that's prior art, right? It is prior art, Your Honor, but And they distinguished from this, they distinguished this patent from the prior art. They did, they put a lot of stake in time-of-flight, to be sure, but the claims themselves don't limit to any particular type of LIDAR. The point being that there are multiple known types of LIDAR, and there are multiple types disclosed in the specification, and the claim is just simply using the broad term LIDAR. Other than in reference to the prior art, in the specification, are other techniques described? There are generic references to pulses that are not necessarily related to time-of-flight, but certainly the references to use of location in the specification as examples of the invention. I'm sorry, I didn't hear the beginning of your question, Your Honor. Are there references in the written description to use of location as an example of this invention? There are no explicit references to location other than the, again, the broad acronym. So in terms of, so if looking at the, this court's Veritas case, again, it was unreasonable to limit construction to a particular file restoration technique when there were multiple known techniques. And here, there are multiple known LIDAR measurement techniques. And again, the specification acknowledges that, albeit with respect to the prior art in the background, but the specification includes a preferred embodiment, and that's really what the board focused on. It really focused on autonomous driving, and they chose to incorporate the preferred embodiment into its construction. Again, the specification broadly describes the term LIDAR, and again, it describes pulse systems generally. But are there non-preferred arguments that are different, like Mizuno's location system? Are there non-preferred embodiments? You focus, you say, this time of flight is a preferred embodiment. Are there non-preferred embodiments that rely on location as Mizuno does? There are no preferred embodiments that describe location in the specification, Your Honor. But it is, I think, undisputed that there are multiple known types of LIDAR. And given that there are multiple known types of LIDAR, and the claim uses simply the broad term LIDAR without any qualification, again, starting with the claims and the understanding Well, the only thing that you rely on to say that there are multiple types of LIDAR or that multiple types of LIDAR that were regularly referred to when you're talking about use of pulses post-date the relevant time frame and aren't mentioned in your opening brief. Is that right? In the opening brief here, Your Honor? Yes. Well, Your Honor, there are a couple of things that we point to. So we point to patent owners, again, patent owners' admission that triangulation systems only typically use continuous wave lasers and that there are multiple types of LIDAR. And so, yes, there is contemporaneous evidence. And I think that's sort of further down the hierarchy. If you look at the claims, again, if you start with the claims, they're much broader than the preferred embodiment. And so it's not simply the extrinsic evidence. Well, so we have a situation where they interpreted the claims in light of the specification. So on your theory that the claims, nonetheless, are interpreted so broadly that they're invalid, we have this contingent motion to amend, which would have resolved all of that. So isn't the most that we could do, even if we were to find substance in what you're saying, is to send it back for consideration of the contingent motion to amend? I think that's right, Your Honor. I think it would have to go back for reconsideration by the patent trial and the billboard. Not that it would have to, but if that happened, the chances of there being a different result, even accepting your argument, they don't seem to be realistic. Well, I think, Your Honor, there are other references applied in response to the contingent motion to amend. And Your Honor, if I could briefly, I hear I'm into my rebuttal time, but if I could just very briefly address the secondary considerations issue. Okay, proceed. So with respect to secondary considerations, the board erred by improperly presuming a nexus between the patent claims and the products without proper consideration of the unclaimed features. And there are two reasons why the board's analysis is flawed. One, under the Fox Factory case that was decided in December of 2019 after the board issued its final written decision, the unclaimed features must be considered as part of the presumption analysis, not just in considering whether the presumption can be rebutted as the board did here. And number two, the board did not provide any explanation for its dismissal of the unclaimed features. And factual findings like this, they must be supported by evidence and explanation. Well, first, I mean, you're reading Fox Factory, I think, way too broadly. I mean, there's plenty of case law that says that the mere presence of an unclaimed feature does not prevent the application of the presumption. In fact, Fox Factory, too, made that clear. Absolutely, Your Honor. And the board expressly said that all of the features to which you pointed were encompassed within the product and the patent. But the couple of differences, Your Honor, if the commercial product has critical unclaimed features relating to the functionality, then nexus can't be presumed, even if the patent claims broadly cover the product. Well, what Fox Factory found was that where there are unclaimed features that are governed by a different patent, then you've got to determine which patent would be entitled to the presumption. And that's where we ended up with Fox Factory, too. And Your Honor, but again, if the unclaimed features are simply, you know, insignificant features, then presuming nexus may be appropriate. But that's not the case here. And the unclaimed features are critical to the success of the product. Okay, let's hear from the other side. Thank you, Your Honor. Okay, Mr. Lomash. Thank you, Your Honor. May it please the Court. I'll start with claim construction as well. And the simple answer is that Velodyne is not reading in the preferred embodiment. It's asking or it asked the PTAB to construe, and the PTAB did construe the term LIDAR according to its plain and ordinary meaning in the context of the specification. And importantly, I think here is it did it making significant fact findings on how a person of ordinary skill in the art would have come into the patent, how it would have understood the term in 2006, in light of the literature in the field. And you can see that in the final written decision at Appendix Page 1213. Do you concede that as of 2006, there were multiple LIDAR techniques that were known? I don't, Your Honor. I think that the term has evolved over time. The contemporary evidence at the time was that LIDAR meant to those of ordinary skill in the art, pulse time of flight radar using laser. And so while there are some more recent documents that refer to other types of LIDAR and that go beyond pulse time of flight, I don't concede that the term itself as a person of ordinary skill in the art understood it coming into the patent meant something different. And that's the fact findings that the PTAB made as well as the board made. What's your response to the argument that your expert actually referred to, used the word typically as it related to time of flight rather than always? He does, Your Honor, and he talks about other types of things that are now called LIDAR. What I think he was very clear about throughout the proceedings was that in 2006, that's what LIDAR meant was pulse time of flight. And absolutely what it means in this patent is pulse time of flight. So even if I'm wrong in this, and even if you accept that LIDAR could have had some other meaning to some people in the field, you have to then go back to where Your Honor started, which is what does it mean in this patent? And then I think it becomes inexorable that you have to construe it in the way that the PTAB does. It starts with the claim language, as Mr. Milch says. And so this goes to sort of the plain meaning. And you'll see in the Fox paper that we cite from 1993, at appendix page 9162 and 63 in the English paper from 2006, that the meaning of the term, and this really goes to your question, Judge O'Malley, was radar using lasers, that it was a play on the term radar, that it was intended to capture that what was being done with LIDAR was essentially radar or sonar now with lasers. And radar is, in fact, a time of flight mechanism. And so even if it's an acronym, like radar is radio distance and ranging, you can't stop with the words. You have to say, what does that mean? And what does that tell somebody of ordinary skill in the art? What it told them was- I'm sorry, go ahead. Not at all. Is there any evidence in the records that other techniques like triangulation either can't or wouldn't prefer to use pulse lasers? I can't think of an instance where the record says you can't do triangulation with a pulse laser. The record is replete with a number of instances, and I don't mean to get off your question, Your Honor, but a number of instances on where you would use triangulation versus pulse lasers or LIDAR, time of flight lasers, and it's all about the distances. And you can see great consistency among the evidence on this, that if it's a close-up distance, like what Mizuno's doing, it's looking for flaws at a millimeter level on a pipe that's very, very close to the emitters, then you're going to use something like triangulation or position, as Judge Lurie put it. You're going to look at the physical location of where the reflected light is detected. But if you're going for distance and you're doing something like autonomous vehicles where you're not looking at something an inch or a millimeter from the bumper of the car, then you're going to use time of flight because it's going to be a better system for capturing that kind of data. But if you're doing fine-tuned, fine-grained analysis of some physical structure, then you're going to use triangulation because you're going to get a much higher resolution. And with triangulation, you use continuous laser sources? So this, again, I'm not sure, Your Honor, that it's exclusively limited to that, but the evidence, and certainly Mizuno is, I think, describing that. I think that it's, I can't think of an instance in the record where Quantergy or Velodyne, for that matter, has shown the court that there is a triangulation system using pulsing. I just don't want to tell you that it doesn't exist because it might. So that's plain language, and I could spend more time on that, but the specification really, I think, carries the day. If you go to the very first sentence, it tells you what this patent's about and what it's improving upon. It starts with the use of a pulse of light to measure distance. So we know we're pulsing, and in that same first paragraph, it tells you that it's time of flight. It says that the time it takes for that pulse of light to return to a detector near the emitter is measured, and a distance can then be derived from that measurement. So we know from the very first paragraph what we're talking about, what the LIDAR is in the 558 patent, and it's pulsed time of flight. And then it just goes on from there. There's numerous references, the board, I should say, at appendix pages 10 and on, spends considerable energy to prove that there are multiple spots where it talks about pulsing and where it talks about time of flight, and I think this is important, especially when you get into the Veritas case, that what the improvement of the invention is, is taking these old lasers that were being used in the DARPA challenge and others that were pulsed time of flight lasers, but single shot. They winked and nodded, as the patent put it. They pivoted on platforms. They didn't rotate, and improving upon those so that they can be used to give you, by rotation, a better field of view and a better perspective in order to let your autonomous vehicle go around corners, avoid obstacles, those kinds of things. And so the invention itself is an improvement, and you can see it in figure three. It's got the single shot laser that's got a pivot function to it. That was the thing that people were putting on their cars in the DARPA challenge, and this is all on the record. But the improvement is clear from the patent. It talks about it, column one lines 32 through 58, improving upon the single lasers, the winking and the nodding, and collecting data one point at a time. And so when you go to the Veritas case, what the court says in Veritas is, well, the patent doesn't explain any aspects of the contemplated process that would make sense only for a file-level restoration versus a block-level restoration. It doesn't say anything about why it would be material, and this is a quote to the challenges assertedly overcome by the invention, whether the background restore application does file or block-level restoration. So the Champion case that Mr. Milch pulls out, the Veritas case, actually would suggest supports our position, which is that when the specification is telling the reader why there's some relevance to the description that goes to the challenges overcome by the invention, those are going to be important hallmarks and understanding if they help construe the claims, and that's what we have here. The whole point of the 558 patent is people were using single-shot winking and nodding lasers, and Mr. Hall had what the world calls the audacious idea of putting lasers and APDs onto a spinning structure, rotating at high speeds, and collecting lots and lots of data from all around the car. I think that I can spend more time on the almost every column. I talked about column one. At column two, there's discussion at lines one through three about how single lasers are inherently limited due to how many pulses per second are possible. At column four, the board cites to the fact that the system of the invention can collect a million time-of-flight distances per second and talks about their standard deviations. At column five, it talks about the processor of the sensor recording the time of flight, and then there's just several other references to pulsing that you see in the figures in columns three and seven. So, I think that basically covers the law and the main points that Mr. Milch made, so I can turn to the secondary considerations if there are no further questions on claim construction. Okay. The first point I'd make is just to respond to what Mr. Milch said. He suggested that what the board did here was only consider their argument, Quantergy's argument, concerning the alleged unclaimed features in determining whether the presumption was rebutted, and that's actually incorrect. If you look at what the board says, it is referring to Quantergy's argument, and it says, Quantergy attempts to rebut Velodyne's evidence of a presumption. It's not saying to rebut the presumption, and maybe it's an unfortunate choice of words to create confusion in this argument, but it says that Quantergy is trying to rebut Velodyne's evidence of a presumption. So, it's still in the process of considering the evidence of whether there is a presumption or not when it looks at those alleged unclaimed features. So, that's just to respond to Mr. Milch. I think the main issue on the secondary considerations issue at this point is that the vast majority of what was said in the brief should be considered to be waived, and we've briefed this in our opposition, but the Quantergy opening brief, and then even in its reply brief, spends 30 pages of factual explication explaining why your honors should find that the secondary considerations are not coextensive with the short handful of sentences, and the Gray brief tries to rebut that, but if you go back through the four pages that the Gray brief points you to, you'll see that it actually completely proves this point. They cite to appendix page 1023, and when you go look at that page, you'll see that it's merely a short list of the allegedly unclaimed features, no factual explanation at all for them, and actually, it's only three of the four features. It doesn't mention software. If you turn to appendix page 1027, you'll see it's three sentences. They do actually mention unclaimed features in the petition in the reply, and your point is that they don't explain what they are? Exactly, and this goes to sort of the concern or the objection they make that the PTAB did not spend enough time rebutting or responding to this argument. They suggest to the court here that the board didn't submit or write down sufficient fact findings about this issue, and my point here is that when you look at it in proportion to what was written to the board, the board has at least as much response as they got in argument from... So, it's commensurate with what was submitted to them? Precisely, precisely, and we cite case law for that as well. What's your response to Quinnager's reading of Fox Factory? Well, I think Your Honor hit it right on the head, which is that Fox Factory is pretty specific to its facts. It's looking at an instance where there are multiple patents that cross across multiple products. It does, in fact, say in pretty simple terms that there were unclaimed features for the bike's chain rings that were core to some of the other patents, and that seemed to be part of at least why the praise and long-felt need and other objective evidence had come in, that it was really going to some of these other unclaimed features. There's just no evidence at all of that here, and you've got to read Fox Factory in light of the cases that come before it. Rambis is one that we cite in our brief, and in Rambis, I think it's very useful to sort of think about the reasoning. In that case, it applies equally here, which is the board found that even though there wasn't a one-to-one correspondence between the secondary indicia and the claim language, that it was clear that the benefits that were alleged to be the unclaimed features derived from the claim language itself. So, stepping back, the case is about a dual-edge data transfer on a memory, and part of the benefit of that memory was that it was fast. It had a clock speed of 250 megahertz, and the board initially found that, well, we're not going to find a nexus here, or we're not going to presume a nexus, because the claims don't mention that clock speed. The Federal Circuit vacated that, remanded it, and found that such a strict requirement was, quote, improper, and the reasoning for that was because that clock speed, that high 250 megahertz, came from the claim functionality, the dual-edge of the memory, and I think you could say the same thing is exactly true here. Many of the unclaimed features, so-called, are actually express words in the claims, like the point cloud itself is a critical part of the claim, and then the fields of view go straight to the rotation and the orientation of the lasers. I think those are the main ones, actually. So, you could always find something and say, well, there's something in the product literature that isn't found in the claim language, which I think is the exercise that Quantergy's gone through, but what they haven't done is actually map the secondary considerations evidence and say, well, here's that evidence, and it's pointing to in the products that's not actually in the claims. They say it in their submissions to the board, but they don't support it. I hear I'm out of time. Thank you. Any more questions for Mr. Loomish? No. No, I'm sorry. All right. Thank you. Mr. Milch, you have your rebuttal time. Thank you, Your Honor. Just to address a couple of points, the question Judge O'Malley asked, you know, where would you use triangulation versus pulses, and it's close-up distances versus far away, and this is a real problem with the construction. The claims, the way they're written now, they don't limit based on distance. They don't limit based on inward-facing versus outward-facing, but the conditional amendment, that would have narrowed the claim to be outward-facing and would have changed the claim, and they knew how to limit the claim. They just didn't do it the first time around. We heard a lot about LIDAR for autonomous vehicles, and Mr. Loomish addressed that, but all the Claim 1 requires is two laser emitters, two detectors spinning at a certain speed, 200 RPM. This doesn't exclude close-up distance measurements. It doesn't exclude inward-facing measurements, and the problem is this overly broad claim. So that's part of the issue that we have with claim construction. With respect to secondary considerations, the problem is that the PTAB didn't really fully address the unclaimed features, whether they did it commensurate in scope with what was briefed, but, you know, telling is a couple of things that Mr. Loomish just mentioned. The critical features of the claim, he mentioned the field of view, and with respect to the vertical field of view, that's not even part of Claim 1. It only comes into play in dependent Claim 4, and it talks about angular separation of the lasers, but there it says nothing of a wide vertical field of view. You really only need to look at the claims for the whole thing to make sense, and the claims are incredibly simple, but look at the devices. They're incredibly complex. They have 64 laser emitter pairs. The claims call for just two. They have processors. They have software, the devices themselves, but then the board looks at this really broad claim and says, well, it's coextensive with the product. It's a really complex product that's supposed to drive your car, and it doesn't address all of these features, the million points. It requires a point cloud to be sure, but it doesn't require a dense point cloud, just a point cloud. So, while the board concluded there are unclaimed features, it didn't find that those features were absolutely required by the claims, and it didn't say how they were required by the claims and how they were supported if they did. I'm sorry, Arne, did you have a question? No, not really. And with respect to the Rambus case, you know, there, again, it was tied to the claim, the objective evidence, the long-felt need, the industry praise. That was related to the, again, specifically to this dual-edge data transfer functionality, and, you know, the actual claim language was directed exactly at that. Here, the claim language isn't directed to the features that are now being heralded as this revolutionary invention, or were at the time. So, and if you look at what Velodyne identified as the critical unclaimed features, again, it's this dense 3D point cloud, 360-degree field of view, a broad vertical field of view. Again, none of that is in there. And when we argued secondary considerations to the board, it was all about the unclaimed features. That was the point. So, it wasn't that it was left out at all. And, Your Honor, if there are no further questions, I'll yield the remainder of my time. All right. I hear no further questions. Thanks to both counsel. The case is taken under submission.